**EXHIBIT A**

**JANUARY 13, 2025**
**FAA TERMINATION LETTER**

**From:** **Morra, Joseph (FAA)** Joseph.Morra@faa.gov
**Subject:** RE: Sky Elements LLC, Waiver No. 107W-2024-02478; demand for reinstatement
**Date:** January 13, 2025 at 8:13 PM
**To:** WES@SCLGRP.COM
**Cc:** Preston@skyelementsdrones.com

Dear Mr. Steimel:

Please see attached response to letter dated  January 9, 2025 (also attached for reference).

Including Preston Ward on the cc line.

Thank you.

Joe Morra
Federal Aviation Administration
Office of Safety Standards (AFS)
Manager, Emerging Technologies Division, AFS-700
202-450-7828

| **Sky Letter to FAA FINAL.pdf**  | **Sky Elements_FAA Response Signed.pdf**  |
|---|---|
| 272 KB | 165 KB |



**U.S. Department
of Transportation
Federal Aviation
Administration**

Aviation Safety
Flight Standards Service

800 Independence Ave., S.W.
Washington, DC 20591

Mr. Walter E. Steimel
1455 Pennsylvania Ave. NW
Suite 400
Washington, DC 20004

Dear Mr. Steimel,

Thank you for your correspondence dated January 9, 2025, regarding the suspension of Sky Elements, LLC's Part 107 Waiver No. 107W-2024-02478.  I am responding on behalf of the Federal Aviation Administration (FAA) regarding your January 9, 2025, correspondence.

The FAA suspended Waiver No. 107W-2024-02478 pending an investigation into the unmanned aircraft operation that occurred on December 21, 2024. The Sky Elements, LLC operation resulted in an accident causing serious injury to a young child.  The FAA has been reviewing additional safety mitigations along with the information submitted by Sky Elements, LLC to assure the safety of persons and property on the ground as well as the National Airspace System.

Per the conditions of Sky Elements, LLC's Waiver No. 107W-2024-02478, the waiver is subject to cancellation at any time by notice of the FAA's Administrator or an authorized representative.  This correspondence serves as notice that the waiver is canceled effective immediately.

The FAA is currently developing a new waiver for Sky Elements, LLC.  The new waiver will incorporate additional safety mitigations with which Sky Elements, LLC will be required to comply.  The new waiver will be subject to cancellation and/or modification should any additional pertinent information arise from the ongoing December 21, 2024 accident investigation. The FAA anticipates that the new waiver will be issued by January 31, 2025.

Sincerely,

Joseph Morra
Manager, Emerging Technologies Division
Office of Safety Standards, Flight Standards Service

Cc: Mr. Preston Ward

**EXHIBIT B**

**DECEMBER 23, 2024**
**FAA SUSPENSION LETTER**

 **Federal Aviation Administration**    Flight Standards Service    800 Independence Ave., S.W.
Washington, DC 20591

December 23, 2024

Sky Elements LLC
Preston Ward
1729 Sawtooth Oak Trl
Keller, TX 76248

Dear Preston Ward:

This letter is to inform you that your part 107 Waiver 107W-2024-02478 is suspended until further notice, pending an investigation into the unmanned aircraft operation that occurred on December 21, 2024 in Orlando, FL. Per the conditions of your Part 107 Waiver 107W-2024-02478, the waiver is subject to cancellation at any time by notice of the Federal Aviation Administration's Administrator or an authorized representative. The Flight Standards District Office team investigating the accident will be your primary point of contact while the investigation is ongoing.

Sincerely,

Derek Hufty
Manager, General Aviation and Commercial Branch (AFS-750)
Emerging Technologies Division
Office of Safety Standards, Flight Standards Service

**EXHIBIT C**

**WAIVER**

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION

# CERTIFICATE OF WAIVER AND AUTHORIZATION

ISSUED TO

**Sky Elements LLC
Responsible Person:  Preston Ward
Waiver Number:  107W-2024-02478**

ADDRESS –

**1729 Sawtooth Oak Trl
Keller, TX 76248**

This certificate is issued for the operations specifically described hereinafter. No person shall conduct any operation pursuant to the authority of this certificate except in accordance with the provisions contained in this certificate.

OPERATIONS AUTHORIZED

Night small unmanned aircraft system (sUAS) operations; Acting as a remote pilot in command (PIC) or visual observer (VO) in the operation of more than one small unmanned aircraft (sUA) at the same time, and pursuant to 14CFR § 89.105 to operate its UA in the National Airspace System (NAS) without broadcasting Remote Identification (RID) subject to the the conditions of this waiver.

LIST OF WAIVED REGULATIONS BY SECTION AND TITLE
**14 CFR §§ 107.29(a)(2) & (b)—Anti-collision light requirement for operations
at night and during periods of civil twilight, and
107.35—Operation of multiple small unmanned aircraft systems**

## STANDARD PROVISIONS

1.  A copy of the application made for this certificate shall be attached to and become a part hereof.
2.  This certificate shall be presented for inspection upon the request of any authorized representative of the Administrator of the Federal Aviation Administration, or of any State or municipal official charged with the duty of enforcing local laws or regulations.
3.  The holder of this certificate shall be responsible for the strict observance of the terms and provisions contained herein.
4.  This certificate is nontransferable.

NOTE—This certificate constitutes a waiver of those Federal rules or regulations specifically referred to above. It does not constitute a waiver of any State law or local ordinance.

## SPECIAL PROVISIONS

Special Provisions Nos. 1 to 31, inclusive, are set forth on the attached pages.

This Certificate of Waiver is effective from September 24, 2024, to July 31, 2025, and is subject to cancellation at any time upon notice by the Administrator or an authorized representative.

**BY DIRECTION OF THE ADMINISTRATOR**

**Emerging Technologies Division, AFS–700**

**SPECIAL PROVISIONS ISSUED TO**

**Sky Elements LLC**

**General.**

This Certificate of Waiver is an amendment which supersedes and replaces Waiver 107W-2023-02319 issued to Sky Elements LLC for operations under 14 CFR 107. Waiver 107W-2023-02319 is no longer valid.

The FAA's Flight Standards Service has reviewed your application to ensure compliance with the requirements of 14 CFR § 107.200 and § 107.205. Pursuant to these authorities, the Administrator finds that the proposed small unmanned aircraft (sUA) operation can be conducted safely under the provisions of this Certificate of Waiver (Waiver) as listed below because you have established adequate mitigations for risks involved with operating your sUA in the manner you described. Adherence to the provisions of this Waiver establishes the required level of safety within the national airspace system.

The Administrator may cancel this Waiver at any time. As a general rule, this Waiver may be canceled when it is no longer required, there is an abuse of its provisions, or when unforeseen safety factors develop. Failure to comply with any provision listed below is a violation of the terms of this Waiver and will serve as justification for cancellation.

List of Regulations Waived by Section and Title. The following regulations are waived:

**14 CFR § 107.29(a)(2) & (b),** Daylight operation, are waived to allow sUAS operations at night and during periods of civil twilight

**14 CFR § 107.35,** Operation of multiple small unmanned aircraft systems, is waived to allow a person to act as the remote Pilot in Command (PIC) or visual observer (VO) to operate multiple small UAS simultaneously.

No part of this waiver will function as an airspace authorization under 14 CFR § 107.41. The FAA's Air Traffic Organization responds directly to requests for such authorizations.

**Common Special Provisions.** The Responsible Person is directly responsible for safety of operations conducted under this Waiver and will ensure the Remote Pilot in Command (remote PIC), manipulator of the controls, and visual observer(s) (VO)[1] comply with all provisions of this Waiver.

1. The Responsible Person listed on the Waiver is responsible to the FAA for the safe conduct of the operations. Prior to conducting operations that are the subject of this Waiver, the Responsible Person:
   a. Must ensure the remote PIC, manipulators of the controls, and VO(s) are informed of the terms and provisions of this Waiver and strictly observe the terms and provisions herein;

   b. Must ensure the remote PIC, manipulators of the controls, and VO(s) are informed and familiar with part 107 regulations; and
   c. Evidence of the above (a and b) must be documented and must be presented for inspection upon request from the Administrator or an authorized representative;

---

[1] Title 14 CFR § 107.3 defines the term "visual observer." Any VO participating in operations conducted under this Waiver must meet the requirements listed in § 107.33 throughout the duration of flight operations.

2. This Waiver may not be combined with any other waiver(s), authorizations(s), or exemption(s) without specific authorization from the FAA;

3. The FAA has the authority to cancel or delay any or all flight operations if the safety of persons or property on the ground or in the air are in jeopardy or there is a violation of the terms of this Waiver;

4. A copy of this Waiver must be accessible and available to the remote PIC at the ground control station during sUA operations that are the subject of this Waiver;

5. The Responsible Person listed on this Waiver must maintain a current list of pilots by name and remote pilot certificate number used in operations under this Waiver. This list must be presented for inspection upon request from the Administrator or an authorized representative;

6. The Responsible Person listed on this Waiver must maintain a current list of sUA by registration number(s) used in operations under this Waiver. This list must be presented for inspection upon request from the Administrator or an authorized representative;

7. For the purposes of this Waiver, direct participants are the remote PICs, persons manipulating the controls, VOs, and any persons whose involvement is necessary for safety of the sUA operation. All other persons are considered non-participants;

**Operations as defined in 14 CFR § 1.1, Specific Special Provisions.** sUAS operations may be conducted under this waiver provided:

**OPERATIONAL PROVISOINS**

8. All operations under this Waiver must use one or more VO as described in the waiver application;

9. All operations must use the lighting system and procedures as described in the waiver application in a manner sufficient to alert approaching aircraft as described in the waiver application;

10. All operations, that are the subject of this waiver, are authorized without the use of RID, as required in Part 14 CFR § 89.105; The authorization is not transferable and only applies when the operator is conducting Part 107 Drone Light Show Operations. This authorization provides relief from the operating provision in 14 CFR § 89.105 only. It does not provide relief from the production requirements in 14 CFR § 89.515, which requires unmanned aircraft produced after September 16, 2022, to have Standard Remote Identification, unless excepted under § 89.501(c). In order to produce UA without Remote Identification to be operated pursuant to this authorization, an exemption from 14 CFR § 89.515 may be needed;

11. Prior to conducting operations that are the subject of this Waiver, the remote PIC and VO must be trained, as described in the Waiver application, to recognize and overcome visual illusions caused by darkness, and understand physiological conditions which may degrade night vision. This training must be documented and must be presented for inspection upon request from the Administrator or an authorized representative;

12. Prior to conducting operations under this Waiver, the operational and restricted area boundaries must be calculated, identified, restricted to access, and monitored as described in the waiver application;

13. At least 72 hours prior to conducting operations that are subject to this waiver, the responsible person or designee must notify the local Flight Standards District Office manager. The notification must include:
    a) The location of the planned sUAS operation,
    b) The time(s) of the planned sUAS operations,
    c) A copy of this Waiver, and
    d) A copy of the airspace authorization, per § 107.41, if required for the location and altitude of the sUAS operation;
    The locations of local Flight Standard District Offices and contact information can be located at https://www.faa.gov/about/office_org/field_offices/fsdo/;

14. The Responsible Person or RPIC must file a Notice to Air Mission (NOTAM) no more than 72 hours and no less than 24 hours prior to operating under this waiver. A NOTAM can be filed by calling 1-877-487-6867 (1-877-4-US-NTMS). The Responsible Person must verify the NOTAM has been issued prior to conducting waivered operations;

15. Communication between the remote PIC and VO must allow for the remote PIC to light the sUA and/or ground the sUA with sufficient time to yield right-of-way in accordance with §107.37 as described in the wavier application;

16. The remote PIC may conduct operations with the makes, models specified in the application, equipped with redundant flight control and transmission systems, and must ensure adequate simultaneous control of the sUA so they remain inside the area of operation, as described in the waiver application;

17. The RPIC may operate up to the maximum number of sUA specified in the application;

18. Multiple sUA operations may only occur in areas in which access is restricted to people who are directly participating in the operation;

19. The remote PIC, the person manipulating the controls, and the dedicated VO must be able to determine the position, attitude, altitude, and direction of flight of each sUA relative to any other aircraft, persons, property, and obstructions during waivered operations. Communication must be adequate for any person directly participating in the operation to halt operations when an unsafe condition occurs;

20. Prior to conducting operations under this Waiver, operational area obstacles and boundaries must be identified and located so as to avoid collision with, or damage to property and non-participating persons, as described in the waiver application;

**TECHNICAL PROVISIONS**

21. As described in the waiver application, prior to operations subject to this waiver, a two-layer geo fence must be set to contain all sUA within the planned operational area;

22. Prior to conducting operations under this Waiver, the Responsible Person must ensure that the two-layer geo-fence system and its associated flight control system operate properly and function as described in the waiver application;

23. The remote PIC must ensure that an individual system failure must not interfere with the operation of any other sUA or cause incidents, accidents, or loss of control involving any other sUA that are subject to this Waiver;

24. The sUAS must be equipped with the flight termination system described in the waiver application. Prior to operations subject to this waiver, the flight termination system must be tested and verified to operate as described in the waiver application;

25. As described in the waiver application, prior to conducting operations that are the subject of this Waiver, the flight controller and the associated flight control system capability for each aircraft, operate properly;

26. Prior to conducting operations, testing must be conducted as described in the waiver application;

27. The ground control station must audibly and visually notify the remote PIC of an sUA malfunction;

28. At all times during operations, the emergency sUA commands described in the waiver application, must be available to the remote PIC;

29. ADS-B out (1090/978 MHz) may not be transmitted from the sUAS when operating pursuant to this Waiver;

30. All emitters used in sUAS must be in compliance with all applicable FCC regulations and all provisions of the FCC authorization granted for the emitter. A FCC experimental authorization may not be used for sUAS operations under this Waiver; and

**ENVIRONMENTAL PROVISIONS**

31. Operations conducted under this Waiver may occur at locations meeting the performance based criteria contained in the waiver application.

**EXHIBIT D**

**WARD AFFIDAVIT**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SKY ELEMENTS, LLC

    Petitioner,

    v.

FEDERAL AVIATION
    ADMINISTRATION

    Respondent.

Case Number: 25-1073

## AFFIDAVIT OF PRESTON WARD

I, Preston Ward, state as follows:

1.    I am an attorney at law (Texas) and both General Counsel and Chief Pilot for Sky Elements, LLC, a Texas limited liability corporation. My investors and I formed Sky Elements in 2021 and I have been the Chief Pilot of Sky Elements for more than four (4) years. I have personal knowledge of the facts stated herein.

2.    Sky Elements operates drone light shows. These shows have increased in popularity as a safer and environmentally friendly alternative to fireworks shows, and Sky Elements has experienced increasing demands for its services.

3.    In 2023 Sky Elements conducted 435 shows consisting of 113,529 drone flights. In 2024 it performed 775 shows consisting of 299,175 drone flights and approximately 54,852 flight hours. During the last 24 months Sky Elements has

1

amassed 75,665 flight hours of drone shows in front of live audiences, and countless testing, training, and demonstration flight hours.

4.     Sky Elements provides its services pursuant to Part 107 Waivers (14 C.F.R. Part 107) issued by the Federal Aviation Administration (FAA). Prior to December 21, 2024, Sky Elements had an exemplary safety record with no injuries to flight crews, spectators, or third parties. On December 21, 2024, however, during a light show performed in Orlando, Florida, three Sky Elements' drones experienced flight deviations resulting in possible contact with spectators.

5.     Sky Elements immediately filed its initial notification of the incident and promptly conducted an investigation into the cause of the incident. It prepared a report to the FAA and proposed amendments to its operating regulations to help prevent future accidents. Sky Elements took all of its remediation efforts within nine (9) days of the incident, as detailed in the Petition for Review in this case and the attachments to the Petition.

6.     The FAA issued a request for information (RFI) on January 3, 2025. Sky Elements responded the same day. The FAA requested modifications to Sky Elements' "waiver document," which Sky Elements submitted the same day, and the FAA stated it would amend Sky Elements' current waiver based upon its submission, permit its waiver to stay in effect until its July 2025 expiration, and observe a test demonstration of the changes conducted before Sky Elements' next

scheduled show on Monday, January 6. The FAA did not amend the waiver or lift the suspension.

7.      Sky Elements resubmitted its proposed operational changes to the FAA on January 9 in an effort to accelerate FAA approval and lifting of the suspension. On the same day counsel for Sky Elements notified the FAA of its resubmission and demanded immediate action. The FAA responded by terminating Sky Elements' waiver. The FAA also indicated that it had a target date for the issuance of a new or replacement waiver to Sky Elements. Since that time the FAA has neither lifted the suspension or reversed the termination of Sky Elements' waiver and has not issued a new waiver. In informal communications and calls FAA operational staff have indicated that while Sky Elements' proposals are acceptable certain administrative holds have delayed or prevented any further action. Given the feedback I have received any further communications with the FAA are futile and there exists no formal mechanism for relief from the FAA other than the steps Sky Elements has taken.

8.      After the FAA suspended Sky Elements' waiver FAA staff and a Sky Elements customer, the City of Garland, Texas, communicated about the suspension to determine whether it would be lifted by July 4th. Based on that conversation the City of Garland cancelled its contract with Sky Elements.

9.      The FAA's actions have caused irreparable harm to Sky Elements.

3

The FAA's indefinite company-wide suspension cost Sky a total of $1,016,676 in lost revenue between December 24, 2024, and January 6, 2025, with an additional loss of $763,082 in revenue for shows that Sky Elements had to refer to third parties to perform. Sky Elements has lost an additional $1,031,000 due to the ongoing suspension and termination. The FAA's termination of Sky Elements' waiver prevents Sky Elements from performing any shows causing a weekly revenues loss of approximately $423,000.

10.     The FAA's communications with the City of Garland, Texas, resulted in termination of Sky Elements' contract and a revenue loss of $150,000.

11.     If the FAA's termination is not immediately stayed and Sky Elements' waiver reinstated Sky Elements will need to lay off all of its employees and permanently cease operations.

12.     I have reviewed the facts contained in the Petition for Review and the Emergency Motion for Stay and Memorandum in Support and affirm that the facts set forth in both are true and correct. I attest that the exhibits attached to the Petition and Emergency Motion are true and correct copies of the documents.

13.     I certify under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and ability.

Date: February 19, 2025

Preston Ward

4

STATE OF TEXAS             )
                                     )
COUNTY OF *TARRANT*    )

     I HEREBY CERTIFY that on the _**19**_ day of _**FEBRUARY**_, 2025, before me, the subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared PRESTON WARD, who made oath in due form of law that the matters and facts set forth in the foregoing Affidavit are true and correct and acknowledges that he executed the foregoing Affidavit for the purposes therein contained.

_____
NOTARY PUBLIC

My Commission Expires: *2-1-2028*

```
JAVIER CANTU
Notary Public, State of Texas
Comm. Expires 02-01-2028
Notary ID 128830140
```

5

**EXHIBIT E**

**WARD LETTER**
**DECEMBER 30, 2024**



Preston W. Ward
817-286-3400   (Main)
preston@skyelementsdrones.com

December 30, 2024

Derek Hufty
800 Independence Ave., S.W.
Washington, D.C. 20590-0001

**_Submitted through electronic mail to [Derek.Hufty@faa.gov](mailto:Derek.Hufty@faa.gov) and via first class mail_**

> Re:     Sky Elements LLC – Letter for Reconsideration of Suspension of Waiver 107W-2024-02478

Mr. Hufty,

     I am in receipt of your letter dated December 23, 2024 ("Suspension Letter"), where you notified me that due to the incident in Orlando on December 21, 2024, Waiver 107W-2024-02478 is suspended until further notice. We immediately complied with suspension and have conducted no operations since December 21, 2024. While we understand and respect the decision for an immediate suspension, this Letter contains additional information that we ask you to review. Based on the information provided herein, Sky Elements respectfully requests that the FAA reconsider the suspension and reinstate waiver 107W-2024-02478.

## I.      Background

     Sky Elements has been the leading drone light show provider in the United States since its inception in 2021. This year (2024) alone, Sky Elements has performed 775 shows in front of public audiences consisting of 299,175 drone flights. Each show is on average 11 minutes in length, inclusive of the takeoff and landing functions. Sky Elements has accumulated approximately 3,291,145 flight minutes (54,852 flight hours) on the UVify IFO platform and the Drone Show Software ("DSS") system this year alone. In 2023, Sky Elements performed 435 shows in front of audiences consisting of 113,529 drone flights. Again, assuming an average show time of 11 minutes, in 2023, Sky Elements obtained 1,248,819 flight minutes (20,813 flight hours). These shows were conducted exclusively using the UVify IFO as well as DSS. In the last 24 months alone Sky Elements has 75,665 flight hours of drone light shows in front of audiences without any injury to either Sky Elements' crew or spectators of the shows. These numbers do not include testing hours flown not in front of public audiences.

Letter for Reconsideration
December 30, 2024
Page 2 of 13

## II.    Summary of Incident

On December 21, 2024, approximately 23 seconds into the Orlando, Florida drone show (the "December 21st Show"), the drone swarm had a mass collision event causing three drones to have flight plan deviations (the "Incident"). Reports suggest that two spectators standing 32 feet from the edge of the hard geofence ("Breach 1") and one spectator standing 63 feet from the edge of the hard geofence ("Breach 2") were injured in the Incident.

## III.    Cause of the Incident

Immediately after being notified of the Incident, I traveled to Orlando so I could inspect the computers, videos of the incident, and log files, and so I could speak with the RPIC (Kenneth Charles "K.C." Sealock, 107 Certificate Number 3904519), other crew members, and city officials. I have attached Mr. Sealock's statement to this letter as Attachment "A". Mr. Sealock has been an RPIC for Sky Elements for 26 months and has performed hundreds of drone shows. Prior to joining Sky Elements, Mr. Sealock was an RPIC for Pixis Drones Shows ("Pixis") for approximately 9 months. Like Sky Elements, Pixis utilized the IFO and DSS platforms. Prior to his time at Pixis, Mr. Sealock assisted with Intel Drone Shows. Mr. Sealock has been a Part 107 Certificate holder since 2016.

### A. Cause #1 – Path Parameter

During my investigation we determined, and as Mr. Sealock's statements indicates, the first cause of the Incident was the failure to set the path parameter files of the drones. The path parameters are crucial in shows that have a four-layer starting grid as the first frame of the animation. A four-layer grid take-off pattern is used in situations where the spacing on the ground is less than 2 meters. Typically, during a show there will be 8 waves of drones taking off, making up the 4 layers in the sky. We use 8 layers to maintain greater separation for safety during a take-off. The drones will lift to their take-off altitude at the takeoff time, then move to their first position. During a transition from take-off altitude to first position the drone lights will turn on to the color of the first frame of the animation. Examples of what these parameters are made up of is below:

```
Group1
DSS-1.PATH3;DANCE_TK_OFF=47;DANCE_MV_POS=25;DANCE_TK_ALT=12;DANCE_FNSH=0;
DANCE_LN_OFF=35; DANCE_GROUP=1
Group2
DSS-2.PATH3;DANCE_TK_OFF=45;DANCE_MV_POS=24;DANCE_TK_ALT=10;DANCE_FNSH=0;
DANCE_LN_OFF=30;DANCE_GROUP=2
Group3
DSS-3.PATH3;DANCE_TK_OFF=43;DANCE_MV_POS=23;DANCE_TK_ALT=8;DANCE_FNSH=0;
DANCE_LN_OFF=25;DANCE_GROUP=3
Group4
DSS-4.PATH3;DANCE_TK_OFF=41;DANCE_MV_POS=22;DANCE_TK_ALT=6;DANCE_FNSH=0;
DANCE_LN_OFF=20;DANCE_GROUP=4
```

A break-down of the meaning behind each parameter is below:

Letter for Reconsideration
December 30, 2024
Page 3 of 13

DDS-X.PATH3 is a reference to the name of the flight path that has been assigned to the drone.

DANCE_TK_OFF sets the take-off time before the start of the show.

DANCE_MV_POS sets time offset in seconds before moving to the show starting positions.

DANCE_TK_ALT sets the take-off altitude of the drones.

DANCE_FNSH sets the landing mode to activate at the end of the path animation. A "0" will place the drones in landing mode (land straight down), a "1" will place the drones in RTL (return to launch/home) mode.  When utilizing a multilayer take off, landing mode must be used.

DANCE_LN_OFF sets the delay between the animation finishing and the time when the drone starts its landing mode.

DANCE_GROUP sets the group of the drone. This parameter is not mission critical per se, but it allows you to organize the drones by group in the controller software.

Using the above parameters as an example with an 18:30:00 start time with an 11 minute show performance a breakdown of the time line of the show is as follows:

18:29:13 – Group 1 begins to take off to 12 meters
18:29:15 – Group 2 begins to take off to 10 meters
18:29:17 – Group 3 begins to take off to 8meters
18:29:19 – Group 4 begins to take off to 6 meters

18:29:35 – Group 1 turns on first frame light and begins to move to first show position
18:29:37 – Group 2 turns on first frame light and begins to move to first show position
18:29:39 – Group 3 turns on first frame light and begins to move to first show position
18:29:41 – Group 4 turns on first frame light and begins to move to first show position

18:30:00 – All drones will begin the show programming

18:41:20 – Group 4 enters land mode and lands strait down from the final frame position
18:41:25 – Group 3 enters land mode and lands strait down from the final frame position
18:41:30 – Group 2 enters land mode and lands strait down from the final frame position
18:41:35 – Group 1 enters land mode and lands strait down from the final frame position

        The December 21st Show was a 1M separation starting grid that required a multi-layer takeoff. While Mr. Sealock indicated that he did not set these parameters, I also verified this statement by reviewing the DSS controller log.  The log acts as a "blackbox" and stores information regarding each action taken in the software.

Letter for Reconsideration
December 30, 2024
Page 4 of 13

A review of the log contains no reference to the path parameters being set. When the parameters are not set, the drones will rely on the existing parameters that remain from the last drone show, and takeoff according to the last parameters set. Furthermore, reviewing video of the incident confirms drones taking off to incorrect altitudes as well as moving to different altitudes for their first position. The first frame of the animation had layers alternating in red and green making it easy to identify these movements.

Item number 22 of the Sky Elements' preflight check list requires the RPIC to set these parameters.



Mr. Sealock failed to follow Sky Elements' standard operating procedures as well as item number 22 on the preflight checklist.

### B. Cause #2 – Show Center Position

During my investigation it was also discovered that Mr. Sealock did not have the show correctly oriented over the physical location of the drones. When performing a show with DSS, the operator must position the show center correctly over the center of the starting grid. This is critical as DSS will use algorithms to assign the correct path to the correct drone based on this position. When this position is not accurate, DSS will map incorrect drones to the flight paths, which will result in collisions during the takeoff and move to position functions. DSS allows you to view this first point position before and after uploading the flight paths on the 2D map to confirm correct position based on the physical location of the drones. Additionally, after uploading the flight paths, a review of the 3D map will confirm each path is correct, if the drones are taking off directly vertically, and there are no crossing paths.

During my investigation I discovered that Mr. Sealock did not have the starting position correctly centered over the drones. The show center position Mr. Sealock uploaded to the drones was 28.5449583471286, -81.3711627772998, where the actual center of the drones was 28.5449938997792, -81.371134865313. There is a deviation of approximately 5 meters (16.5 feet) between physical show center and the show center Mr. Sealock set on the drones. Not only did this error result in a critical flight failure, it also positioned the flight path closer to spectators than planned. This error is obvious when reviewing the 3D view page of DSS. Screenshots of the impact of the deviation are below. Furthermore, when updating the show center location, Mr. Sealock only had 498 drones selected rather than 500, meaning 2 drones did not have the same center position as the rest, in addition to the geofence being out of place.

Letter for Reconsideration
December 30, 2024
Page 5 of 13

 

The left photo is how Mr. Sealock had the show set as you can see it repositions the show and has numerous crossing paths. The right photo illustrates no crossing paths and correct orientation.

Items number 26, 27, 28, 29, 40, and 41 of the Sky Elements' preflight checklist requires the RPIC to do these checks.

 

This item is covered twice on the preflight checklist as it is critical for a safe flight. Mr. Sealock failed to follow Sky Elements' standard operating procedures as well as item numbers 26-29, 40 and 41 of the preflight checklist.

### C. Cause #3 – Show Heading incorrect

Furthermore, during my investigation I discovered that Mr. Sealock did not have the show heading entered correctly. In the email Mr. Sealock received that provided him with the show files, it was indicated that the show heading should be 121.3. The heading Mr. Sealock set was 114.6. This figure is set by manually positioning the show location in DSS. The deviation resulted in the show flight position being off by approximately 18 meters (60 feet). This misalignment was towards the location where the spectators were

Letter for Reconsideration
December 30, 2024
Page 6 of 13

reportedly injured. Mr. Sealock's error caused the show to be positioned closer to the spectators than planned.

Approx Coords: 28.544973127818, -81.3711583039342
Approx Heading: 121.3

Above is the information contained in the email sent to Mr. Sealock along with the show file. Below is the heading entered into the DSS software by Mr. Sealock.

Dance heading (deg)

114.6  + −

Item number 14 of Sky Elements' preflight checklist requires the RPIC confirm the show heading with the heading provided by the animation team.



→ **Preflight checklist**

● Adjust Heading according to show design email

Mr. Sealock failed to follow Sky Elements' standard operating procedures as well as item number 14 of the preflight checklist.

### D. Cause #4 – Failure to update Distance Between Geofences

Moreover, during my investigation I discovered that Mr. Sealock did not update the distance between the normal geofence and the hard geofence. On December 9, 2024, at my direction, Javier Cantu sent out a note to all Sky Elements' RPICs instructing them to reduce the distance between the normal geofence and the hard geofence to 1 meter rather than 5 meters. Not only did Mr. Sealock receive this information, he also acknowledged such receipt.

Letter for Reconsideration
December 30, 2024
Page 7 of 13






      Had Mr. Sealock followed the required procedure and reduced the buffer distance margin, an additional 4 meter (13.2 feet) buffer zone between the spectators and the edge of the hard geofence would have been present.

### E. Cause #5 – Failure to Set the Polygonal Geofence Correctly

      Additionally, Sky Elements' standard operating procedures requires the RPIC to set the polygonal geofence as tight as possible to the show flight area. Adjusting the geofence is item number 15 on the Sky Elements' preflight checklist. Below are screen shots showing variances in distance between one side to the other. Mr. Sealock did not set the geofence in accordance with Sky Elements' procedure on the side of the show where the spectators were reportedly injured.

Letter for Reconsideration
December 30, 2024
Page 8 of 13

 

The light blue line in the images above is the edge of the show, the orange line is the soft geofence, and the red line is the hard geofence. The left photo was taken from an area of the manually set fence that shows correct spacing between the show and the geofence. The photo on the right was taken from the manually set fence on the side facing where the spectators were reportedly injured. The spacing between the show footprint (blue) and the geofences (yellow and red) depicted in the right photo is significantly wider and in violation of Sky Elements' operating procedures. Mr. Sealock's failure to follow Sky Elements procedures resulted in a geofence a minimum of five additional meters (16.5 feet) closer to spectators than intended.

##### IV.    Verification of Flight Termination Systems

I have not been able to find any video evidence verifying Breach 2 activating its flight termination system and we do not have access to the log file on the drone. However, I have been able to locate video evidence showing Breach 1 activating its flight termination system as intended.  Such video is located https://www.tiktok.com/t/ZTYW1PfCt/

Screenshots of the video are below which confirm its activation of disarming the motors and the drone in a free fall trajectory.

 

The left photo confirms the drone is on its side in a free fall state. Also, the propellers are not spinning.  The right photo shows the drone triggering a yellow led indicating a failsafe state.

Additionally, in the 75,665 performance flight hours that Sky Elements has performed, in every instance that the hard geofence should activate, it has activated as

Letter for Reconsideration
December 30, 2024
Page 9 of 13

intended.  While these situations are rare, in every circumstance the drone disarmed and landed as expected. We have no reason to believe Breach 1 did not activate its flight termination system.

## V.     Additional Procedures and Policies not followed

In addition to the above violations of Sky Elements' policies, procedures, and pre-flight checklist, Mr. Sealock failed to perform the following required pre-flight items:

Preflight Checklist item number 19, which uniformly sets additional drone parameters. While Mr. Sealock did attempt to set these items, he did so after starting the show and the commands returned an error. Upon reviewing the DSS logs, approximately 474 drones had these set correctly while 26 did not. While Mr. Sealock's action is not believed to have contributed to the incident, it is however, a violation of Sky Elements' procedures. The drone parameters are different parameters than the path parameters. This is not a mission critical violation.

Preflight Checklist items 23, 24, 25, and 39, which are necessary to make sure all drones are properly calibrated and ready for flight, were not followed.  Again, this is not believed to have contributed to the incident, however, it is a clear violation of Sky Elements' procedure.

Sky Elements utilizes a screen recording device to capture all actions of setup, as well as all moments of the flight.  It is Sky Elements' policy that these devices be used so that post flight review can confirm that all Sky Elements' procedures and protocols were followed. During the December 21st Show, Mr. Sealock did not start this video recorder.

Lastly, Sky Elements' procedures and policies require that the drones are plugged in and made "show ready" well before show time and the drones are then unplugged and plugged back in 65 minutes to show time. Preflight check list items 37-52 are the final checks and steps to confirm a show is ready to fly. Mr. Sealock attempted to get the entire show ready to fly in approximately 47 minutes prior to the scheduled launch time in violation of Sky Elements' procedures and policies.

## VI.     Conclusion on the Event

Mr. Sealock's conduct at the December 21st Show was strictly against Sky Elements' training, procedures, and policies. As explained above he failed to address multiple items in the preflight checklist. ***Had Mr. Sealock followed our existing policies and procedures, the incident would not have occurred.*** It is believed that Mr. Sealock did not go through the preflight check list ***at all.***

Additionally, the combination of several points of human error resulted in the loss of approximately 105 feet of buffer distance that was planned for the operation. Had Mr. Sealock followed the policies and procedures, both Breach 1 and Breach 2 would have landed well within the confines of the lake.

Letter for Reconsideration
December 30, 2024
Page 10 of 13

## VII.    Subsequent Remedial Steps

While we are confident that our existing policies and procedures would have prevented the incident had they been followed, safe drone shows are paramount to Sky Elements. Accordingly, we have identified additional steps that could be taken to further enhance safety of drone shows, as well as mitigate the risk of human error.

1. Mr. Sealock is no longer authorized to fly drone shows for Sky Elements.

2. Effective immediately, all Sky Elements' drone shows will have no less than two part 107 holders. There will be defined Pilot and Copilot roles. A copy of an overview of these roles are attached hereto as Attachment "B".

3. All pilots and copilots will undergo retraining to reiterate existing safety and operating procedures, as well as to inform the pilots and copilots of the newly implemented enhanced policies described herein. This is to include details on the duties and responsibilities of the copilot as well as enhanced safety and emergency procedure training. This training will also include a review of the NTSB Advisory on drones dated July 29, 2016, a copy of which is attached as Attachment "C".

4. Effective immediately, Sky Elements has terminated the use of a digital checklist. Instead, Sky Elements will require copilots to complete a paper checklist confirming that the pilot performed each checklist item. The paper checklist will be signed by both the copilot and the pilot at the end of the operation. Should this form not be returned or signed by both pilot and copilot, they will no longer be allowed fly a drone show for Sky Elements. A copy of the paper check list is attached hereto as Attachment "D"

5. In the event the screen recording device is not functioning, the show set up procedures will halt until it is functional. Should the screen recording device be deemed not functional, the RPIC will call Sky Elements' support, who will troubleshoot and verify non-functionality. If the screen recording device cannot be repaired, a software screen recording device will be used as a backup. These recordings, as well as the paper preflight checklists will be stored and randomly audited for compliance with Sky Elements' policies and procedures.

6. All drone shows will have two additional hours of setup time to avoid any time pressure.

7. We will implement a "15 minute rule" from being "show ready" from the schedule show start time. If all aspects of the drone show are not "show ready" before this 15 minute time frame, the show time shall be pushed by a minimum of 15 minutes. For example, if a drone show start time is supposed to be

Letter for Reconsideration
December 30, 2024
Page 11 of 13

6:30PM and the RPICs have not completed all their preflight checks by 6:15PM, the earliest possible show time would be 6:45PM.

8. There has been a full equipment recall for computers to ensure consistency across the ground control stations and to ensure that newly implemented geofence policies are in place on all machines. The horizontal distance from takeoff position to first point will be reduced to two meters on all ground control stations going forward. The standard geofence offset distance between the normal fence and the hard fence is to be set at half of a meter effective immediately. All pilots and copilots are required to confirm this setting before uploading geofence. Drone shows will be halted until all computers have been verified. These settings are to be verified on the checklist before each flight as well.

9. After setting grid and preparing the show, pilots and copilots will be required to contact Sky Elements' support helpdesk for any show heading that deviates more than one degree from the estimated show heading sent with the show file. The helpdesk will then involve other departments as needed. The pilot and copilot must get express authorization from the helpdesk for heading deviation.

10. The Sky Elements' Operation handbook will be updated with more specific procedures for what to do in the event of an accident. The updated procedure is as follows: If an accident occurs, the RPIC is to immediately (chronologically): call 911, the NTSB (following the procedure outlined below), and me, personally. Within ten days after any accident, the pilot shall complete a drone zone incident form and send proof directly to me.

    NTSB reporting: Contact the NTSB's 24-hour Response Operations Center (ROC) at 844-373-9922 to file a report. When you contact the following information will be provided:
       (a) Type, nationality, and registration marks of the aircraft;
       (b) Name of owner, and operator of the aircraft;
       (c) Name of the pilot-in-command;
       (d) Date and time of the accident;
       (e) Last point of departure and point of intended landing of the aircraft;
       (f) Position of the aircraft with reference to some easily defined geographical point;
       (g) Number of persons aboard, number killed, and number seriously injured;
       (h) Nature of the accident, the weather and the extent of damage to the aircraft, so far as is known; and
       (i) A description of any explosives, radioactive materials, or other dangerous articles carried.

11. For the next 90 days, the RPIC shall be required to contact me for authorization prior to being able to start a show sequence. At that time, I shall remotely

Letter for Reconsideration
December 30, 2024
Page 12 of 13

connect to the ground control station to verify each of the settings of the show to confirm compliance with the show design. After the 90-day period, this system will be re-evaluated and extended as necessary. Should there be extenuating circumstances preventing my availability, an alternate point of contact will be identified and communicated to all pilots the morning of the show.

12. A minimum safety buffer of 155 feet will be utilized going forward from the edge of the hard geofence to spectators.

## VIII. Standards for suspension

Section 107.713 of Tile 49 of the Code of Federal Regulations provides the standards for modifying, suspending, or terminating an approval. Sub Part b provides as follows:

The Associate Administrator may modify, suspend or terminate an approval, as appropriate, *on finding that*—
(1) Because of a *change in circumstances*, the approval no longer is needed or no longer would be granted if applied for;
(2) The *application* contained *inaccurate or incomplete* information, and the approval would not have been granted had the application been accurate and complete;
(3) The *application* contained *deliberately inaccurate or incomplete* information; or
(4) *The holder knowingly* has *violated the terms* of the approval or an applicable requirement of this chapter in a manner demonstrating lack of fitness to conduct the activity for which the approval is required. [emp. added]

While we have no objection to the action taken by the Associate Administrator due to the media coverage and the initial unknown nature of the injuries and circumstances leading to the incident, the Suspension Letter does not indicate that a finding was made for any of the items listed in 49 CFR 107.713(b).

Subpart b(1) does not appear to be applicable to the circumstances surrounding the suspension. Furthermore, there has been no indication that there was inaccurate or incomplete information provided in the application to support a finding of subpart b(2). An examination of the incident as outlined above verifies the information contained in the application, including the functionality of the hard geofence. Furthermore, the errors of Mr. Sealock outlined in detail above would not support a finding that the application contained inaccurate or incomplete information. Additionally, there has been no indication that the application contained *deliberately* inaccurate or incomplete information that would support a finding in subpart b(3) with the information contained in this letter.

Letter for Reconsideration
December 30, 2024
Page 13 of 13

Lastly, subpart b(4) requires a finding that the holder (myself) **_knowingly_** violated terms of the approval. As outlined above, Sky Elements' policies, procedures and preflight checklist were not followed during the December 21st show. Had the polices been followed, the Incident would not have occurred. Furthermore, Mr. Sealock has almost three years of experience piloting drone shows, has been RPIC for hundreds of drone shows, and has always demonstrated the utmost attention and compliance with Sky Elements' policies and procedures. He is very experienced, and I have observed him being very thorough throughout his setup and operation procedures. Prior to the December 21st Show, I had no reason to believe that Mr. Sealock would have violated Sky Elements' standard procedures and failed to perform the preflight checklist. It is extremely out of character that he committed so many egregious policy and procedural violations. Each cause of the incident was already specifically addressed on the Sky Elements' preflight checklist. Accordingly, a finding that the holder **_knowingly_** violated the terms of the application would not be warranted given the additional information contained in this letter.

49 CFR 107.713(c) provides that, except as provided in Subpart (d), before an approval is suspended the holder must be notified in writing and given 30 days to respond. Subpart (d) allows the suspension to be effective immediately only if necessary to avoid risk of harm to persons or property. We do not believe a finding is warranted to support an immediate suspension without notice and opportunity to respond. Even if such a finding did exist, the information contained in this letter proves that an ongoing immediate risk of harm to persons or property did not and does not exist. As discussed herein, our existing policies and procedures would have prevented the incident had they been followed. Nevertheless, the remedial measures outlined above remove any ongoing concerns of a risk of potential harm to persons or property.

For the reasons outlined herein, Sky Elements respectfully requests waiver 107W-2024-02478 be reinstated as this suspension is causing irreparable harm to Sky Elements.

We have always believed in a collaborative relationship between Sky Elements and the FAA. We are open to discussing further mitigation the FAA may deem necessary. We believe given our track record and vast experience, that the outlined mitigations will prevent the errors that were the cause of the Incident at the December 21st Show.

Thank you for your time and consideration, and as always, please let me know if you have any questions or concerns.

Sincerely,

Preston W. Ward
Sky Elements Drone Shows
Responsible Person under Waiver 107W-2024-02478

## Attachment A

Mon, Dec 23, 2004

RPIC statement for Dec 21, 2024 Incident

My name is Kenneth (KC) Sealock, and I was RPIC on the date in question. I have been a drone swarm pilot for Sky Elements Drone Shows for 2 years. On the date in question, we were scheduled to perform two flights of 500 drones from the small peninsula at the north east corner of Lake Eola in Orlando, FL. Weather was optimal, and site security was in place as expected with park staff and local law enforcement cooperation.

Setup for the day was standard, performing motor and propeller checks on all aircraft, getting software and programming matched and updated on our show computers, as well as working together to lay out the grid of 500 drones in the space designated. Wi-Fi access points were distributed around the perimeter of the grid, and the RTK system was set up and dialed in for more accurate GPS location of the drones in flight.  Safety checks included having the client trim a branch of one of the trees in order to allow adequate space for the liftoff sequence.

        Roughly an hour before show time, crew plugged in drones and brought the network online. Nothing out of the ordinary was noted in the process, and standard troubleshooting steps were taken to get everything ready for show time. Initially roughly 5 drones were not accepting data for launch, and standard process of troubleshooting Wi-Fi access points was implemented, finding all 500 drones on network with about 5 minutes left until show time. I determined that a soft reboot of the whole fleet would bring all aircraft to show ready (standard turning all drones off and on again via the ground control software rather than manually unplugging and replugging in order to reset the drones and allow for better connection to the network and a solid GPS link). Reboot went as expected, and systems showed green across the board, except for two drones, which were removed from the fleet, to stay on the ground at launch and allow the rest of the show to continue. Drones were armed, and the countdown sequence was initiated. At launch it was noted that the launch parameter file was not pushed after final paths had been set. This was noticed when the drone "layers" did not lift uniformly. In most cases, this would contribute to closer proximity of the drones during launch, ie. 1m separation within the grid, but the show center was not completely aligned.

I closely monitored the remaining drones in the air, and between visual observation of their stability, as well as telemetry readings from the ground control station, I felt it safer to   allow the remainder of the show to proceed. Due to the steps involved with pausing a show, and recovering airborne drones, the designated flight paths were a safer option for both the audience and the aircraft. The remainder of the fleet flew as expected, and landed at their predetermined locations.

-Kenneth C Sealock RPIC

107 Certificate - 3904519



Preston W. Ward
817-286-3400   (Main)
preston@skyelementsdrones.com

### A. Pilot

The Pilot is the primary individual responsible for the successful execution of the drone light show. Their duties include:

1. Overall Responsibility: The Pilot oversees the entire drone show operation from start to finish.
2. Site Issues: Upon arrival at the show site, the Pilot is responsible for identifying and addressing any site-specific issues that could impact the show.
3. Client Interaction: The Pilot acts as the primary point of contact for the client, ensuring all client-related concerns are addressed professionally and efficiently.
4. Setup and Troubleshooting: The Pilot leads the setup process and is in charge of troubleshooting any technical issues that arise during the preparation of the show.
5. Safety and Approval: The Pilot, in collaboration with the Co-Pilot, must verify that all safety measures have been met and sign off on the readiness of the show. If there is a disagreement, the Pilot must escalate the concern to Preston Ward for resolution.

### B. Co-Pilot

The Co-Pilot is the assistant to the Pilot and plays a critical role in supporting the successful execution of the drone show. Their duties include:

1. Crew Organization: The Co-Pilot is responsible for organizing the crew on-site to ensure efficient and effective operations.
2. Grid Layout: The Co-Pilot oversees the accurate layout of the grid as part of the show setup process.
3. Safety Checklist: The Co-Pilot assists the Pilot in completing the safety checklist, ensuring all required procedures are followed.
4. Safety and Approval: The Co-Pilot must agree with the Pilot on the readiness of the show. Both must sign off that the show is safe to fly. In the event of a disagreement, the Co-Pilot must escalate the concern to the Preston Ward for resolution.

### C. Escalation Procedure

If the Pilot and Co-Pilot cannot agree on the safety or readiness of the show, they must:

1. Contact the Preston Ward immediately.
2. Share their individual concerns and provide any relevant details about the issue.
3. All three parties must agree that the show is safe before proceeding.

**NTSB** | NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF AVIATION SAFETY
**Advisory**

July 29, 2016

# Advisory to Operators of Civil Unmanned Aircraft Systems in the United States

## INTRODUCTION

The use of small civil unmanned operating systems (sUAS) is growing rapidly, with changes happening on a nearly daily basis. In particular, the Federal Aviation Administration (FAA) and the Department of Transportation's Office of the Secretary issued a new final rule on the operation and certification of small unmanned aircraft systems[1] and the FAA recently issued a new "blanket Certificate of Waiver or Authorization (COA)" for commercial Section 333[2] and Public Aircraft operators.

FAA authorizations for UAS operation direct UAS pilots and operators to provide notification to the FAA in the event that any of a series of enumerated occurrences takes place during the operation of a UAS. Included in these instructions are reminders that the FAA procedures "are not a substitute for separate accident/incident reporting required by the National Transportation Safety Board (NTSB) under 49 CFR §830.5." By means of this Advisory, the NTSB reminds operators of any civil UAS, other than those operated for hobby or recreational purposes, of the NTSB's accident and incident reporting requirements in Part 830 of title 49, Code of Federal Regulations.

## BACKGROUND

In August of 2010, the NTSB revised its Part 830 regulations to clarify that its accident and incident notification requirements apply to unmanned aircraft as well as conventional manned aircraft.[3] Section 830.5 instructs operators of civil aircraft and certain public aircraft to immediately, and by the most expeditious means available, notify the NTSB when an accident or listed incident occurs.

An accident **will** result in the NTSB's initiating an investigation and report with a determination of probable cause. In order to minimize the burden on operators of a small UAS and the NTSB, we have exempted from the definitions of "aircraft accident" and "unmanned aircraft accident" in section 830.2 of the NTSB regulations those events in which there is only substantial damage to the aircraft (no injuries), and the aircraft has a maximum gross takeoff weight of less than 300 pounds.

Although any of the incidents enumerated in section 830.5 would require the operator to notify the NTSB, the agency at its discretion may decide to conduct a full investigation with probable cause.

---

1   See 81 *Fed. Reg.* 42063 (June 28, 2016).
2   Section 333 of the FAA Modernization and Reform Act of 2012 provides that "[i]f the Secretary of Transportation determines that … certain unmanned aircraft systems may operate safely in the national airspace system, the Secretary shall establish requirements for the safe operation of such aircraft systems in the national airspace system."
3   75 *Fed. Reg.* 51955 (August 24, 2010).

**REQUIREMENTS**

A civil UAS operator must immediately and by the most expeditious means, notify the NTSB of an accident or incident. An unmanned aircraft accident is defined in 49 C.F.R. § 830.2 as an occurrence associated with the operation of any public or civil unmanned aircraft system that takes place between the time that the system is activated with the purpose of flight and the time that the system is deactivated at the conclusion of its mission, in which:

(1)  Any person suffers death or serious injury; or

(2)  The aircraft has a maximum gross takeoff weight of 300 pounds or greater and sustains substantial damage.

Section 830.2 also provides definitions of what constitutes "serious injury" and "substantial damage".

Operators must consider that the rest of the reporting requirements for serious incidents listed in section 830.5 apply regardless of UAS weight. Listed serious incidents that apply to all UAS include the following events:

· Flight control system malfunction or failure: For an unmanned aircraft, a true "fly-away" would qualify. A lost link that behaves as expected does not qualify.

· Inability of any required flight crewmember to perform normal flight duties as a result of injury or illness. Examples of required flight crewmembers include the pilot, remote pilot; or visual observer if required by regulation. This does not include an optional payload operator.

· Inflight fire, which is expected to be generally associated with batteries.

· Aircraft collision in flight.

· More than $25,000 in damage to objects other than the aircraft.

· Release of all or a portion of a propeller blade from an aircraft, excluding release caused solely by ground contact.

· Damage to helicopter tail or main rotor blades, including ground damage, that requires major repair or replacement of the blade(s).

· An aircraft is overdue and is believed to have been involved in an accident.

**EXAMPLES**

Below are examples of potential events.

· A small multirotor UAS has a fly-away and crashes into a tree, destroying the aircraft: Not an Accident, (though substantial damage, too small, and no injuries), but the operator is required to notify the NTSB of a flight control malfunction. NTSB *may* initiate an investigation and report with a determination of probable cause..

· A small multirotor UAS has a fly-away and strikes a bystander causing serious injury: Accident (resulted in serious injury). The operator is required to immediately notify the NTSB. The NTSB *must* investigate the accident and determine a probable cause.

· A small multirotor UAS hits a tree due to pilot inattention on a windy day: Not an Accident (too small, even if substantial damage). However, the operator is required to notify the NTSB if other criteria of 830.5 are met. NTSB *may* initiate an investigation and report with a determination of probable cause.

· A large, experimental UAS (400 lbs) has a structural failure and crashes in a remote area: Accident (substantial damage and gross takeoff weight of 300 lbs. or greater). The operator is required to immediately notify the NTSB. NTSB *must* investigate and determine a probable cause.

We'd also like to remind unmanned aircraft operators that none of Part 830 is intended to apply to hobbyist or recreational operators as described in section 336 of the FAA Modernization and Reform Act of 2012[4] and applicable FAA guidance.

We hope this advisory serves as a useful reminder to the UAS community that the NTSB remains committed to performing its long-standing mission to support air safety through accident and incident investigation, while placing a minimum burden on this growing industry.

For further information or questions, you may contact:

Bill English
National Transportation Safety Board
Major Investigations (AS-10)
bill.english@ntsb.gov
202-314-6686

---

4  Section 336(c) states that the term the term ''model aircraft'' means an unmanned aircraft that is—
   (1) capable of sustained flight in the atmosphere;
   (2) flown within visual line of sight of the person operatingthe aircraft; and
   (3) flown for hobby or recreational purposes.

**Figure 1 – Determining UAS Occurrence Reporting Requirements to NTSB[5]**



---

5  Figure 1 applies to any unmanned aircraft operated under Part 107, 333, civil COA, experimental certificate, etc. UAS operators should note that they may have additional reporting requirements to the FAA, military, or other government agencies depending on the applicable regulations under which they are operating.

**Attachment D**

**Show Name:** _____

**1. UPON ARRIVAL TO SITE T:-08:00:00**
- ☐ Confirm Site Plan & details of site
- ☐ Take Photos of setup area
- ☐ Check-in with client
- ☐ Confirm number of drones
- ☐ Confirm number of batteries
- ☐ Check all necessary equipment
- ☐ Check weather and wind forecasts
- ☐ Brief Crew on do's & don'ts and show setup

**2. POWER ON CHECK**
- ☐ Bluetti
- ☐ Network Power Strip
- ☐ Laptops / CC
- ☐ Ninja recording screen

- ☐ Access point(s)
- ☐ RTK BS
- ☐ Drones
- ☐ Network Communication
- ☐ Timecode test (GEN)
- ☐ GPS Survey Accuracy (0.35)
- ☐ Redbutton Injecting data

**3. SHUTDOWN CHECK**
- ☐ Drones unplugged
- ☐ Power off bluetti
- ☐ Laptops
- ☐ RTK BS
- ☐ Network Power Strip
- ☐ Access Points Disconnected

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Show Checklist**

**1. SYSTEM CHECK T:~06:00:00**
- ☐ Start recording on black magic
- ☐ Drones Added to fleet
- ☐ GPS injecting Data
- ☐ RTCM Data Received
- ☐ Correct Dance Loaded
- ☐ Show coordinates (lat, long, alt.)
- ☐ Show oriented audience right (verify w/ email)

**2. DRONE CHECK**
- ☐ Pre-flight inspection
- ☐ Pre-Flight Errors
- ☐ Fleet replenished
- ☐ Heading check

**3. CONTROL CENTER CHECK**
- ☐ Confirm spacing between hard and soft fence set to one half meter
- ☐ 2D Map displays adjust and push Geofence
- ☐ Upload Location
- ☐ Assign by location
- ☐ Set drone parameters
- ☐ Upload paths
- ☐ Set path parameters
- ☐ Heading Check (verify w/I 1 degree of design)
- ☐ Calibrate as needed (bottom 3 columns)
- ☐ 3D Map paths not crossing
- ☐ Confirm horizontal distance to first point less than two meters
- ☐ Maximum altitude
- ☐ Minimum altitude
- ☐ Battery percentages
- ☐ Drones unplugged
- ☐ Stop recording

**4. POWER ON DRONES T:-01:00:00**
- ☐ Start recording
- ☐ Drones plugged in
- ☐ Drones count verified

**5. PREFLIGHT CHECK T:-00:30:00**
- ☐ VOs com check
- ☐ VOs position check
- ☐ Clear Grid
- ☐ GPS quality (12 sats needed)
- ☐ 3D view path check
- ☐ Batteries at required levels

**6. 15 Minute Rule T:-00:15:00**
- ☐ Confirm show ready
- ☐ Confirm all safety standards met
- ☐ Call COA number if specified on call sheet or required for airspace

**7. FLIGHT CHECK Initiate Launch Sequence**
- ☐ ARM Drones
- ☐ Set Time (00:02:30:00)
- ☐ Upload time
- ☐ Dance Command
- ☐ Confirm Drones are in Auto Mode
- ☐ Drone Lights on (10 seconds before launch)
- ☐ Countdown and LAUNCH

**8. IN FLIGHT CHECK**
- ☐ System Status
- ☐ Countdown Animation End

**9. LANDING CHECK**
- ☐ All Drones Landed?
- ☐ Report "Grid Clear"

**10. POST FLIGHT CHECK**
- ☐ Total Hole Count
- ☐ Missing drone recovery
- ☐ Power off Drones
- ☐ Stop recording
- ☐ Post Flight Report
- ☐ Checkout with client

---

RPIC Signature:

X_____

Date: _____

Copilot Signature:

X_____

Date: _____

# EMERGENCY PROCEDURES

## LOSS OF PRIMARY OR SECONDARY COMMUNICATION
- Confirm COM port activated
- Reboot Rebutton software verify GPS injection
- Network equipment
- CC network connection
- Backup antenna

***IF radio connection cannot be reestablished***
- Verify Land of all Drones

## LOSS OF DSS SW
- Restart DSS SW
- If required, restart PC
- Alternatively use backup PC

## AIRCRAFT INBOUND < 500ft AGL
- HIGHLIGHT ALL
- Dist. < 1NM outside NOTAM
- Entering NOTAM area

## OUTSIDE WEATHER LIMITS
- If wind > 25mph
- If visibility below minimums
- If rain is more than moderate

## DRONE FLIES INTO RESTRICTED ZONE
- Make immediate evaluation of how to proceed safely
- Proceed, land, or disarm accordingly
- **UPON ALL DRONES LANDING**
- If no injury
  - Immediately notify Preston Ward
- If there is injury
  - Call 911
  - Call the NTSB (following procedure below)
  - Call Preston Ward
  - Within 10 days fill out Drone Zone report and send proof to Preston Ward

## ABNORMAL PROCEDURES

### UAS LEAVING GEOFENCE
- Note loss of drone
- Inform PM
- Continue show
- If more than 20% of UAS are lost – Disarm

### GPS LOSS
- Note loss of drones
- Inform RPIC
- Abort Show
- Recover landed drones
- Total count

### NTSB CONTACT PROCEDURE

Contact the NTSB's 24-hour Response Operations Center (ROC) at 844-373-9922 to file a report. Contacting the ROC satisfies 49 CFR 830.5.  A phone call is sufficient initially, but a written follow-up may be required. When you contact the NTSB, 49 CFR 830.6 spells out exactly what needs to be reported to them.

The notification required in § 830.5 shall contain the following information, if available:
(a) Type, nationality, and registration marks of the aircraft;
(b) Name of owner, and operator of the aircraft;
(c) Name of the pilot-in-command;
(d) Date and time of the accident;
(e) Last point of departure and point of intended landing of the aircraft;
(f) Position of the aircraft with reference to some easily defined geographical point;
(g) Number of persons aboard, number killed, and number seriously injured;
(h) Nature of the accident, the weather and the extent of damage to the aircraft, so far as is known; and
(i) A description of any explosives, radioactive materials, or other dangerous articles carried.

**EXHIBIT F**

**EMAILS**

**Tuesday, January 7, 2025 at 14:27:00 Central Standard Time**

| | |
|---|---|
| **Subject:** | Re: Orlando Show |
| **Date:** | Thursday, January 2, 2025 at 2:20:03 PM Central Standard Time |
| **From:** | Preston Ward |
| **To:** | Doherty, Christopher M (FAA) |
| **Attachments:** | image007.png, image012.png, image013.png, image014.png, image015.png, image016.png, image002.png, image003.png, image004.png, image005.png, image006.png, image017.png, image001.png, image010.png, image011.png, image018.png, image009.png, image008.png |

I submitted the updated waiver application, operational manual, and checklist as 107W-2025-00009.

Please let me know if you need any clarification or further documentation on my end.

## Preston Ward

General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Date:** Thursday, January 2, 2025 at 1:30 PM
**To:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: Orlando Show

I put together a calculator that determines the distance based on the formula.  Adding 100 feet of show height extends the trajectory 10 feet or so.

How about adding 10 meters (33 feet) for every 100 feet above 400.  So if a show was 500 feet buffer would be 233, 600 would be 266, and 700 would be 299.

## Preston Ward

General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

**From:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Date:** Thursday, January 2, 2025 at 12:56 PM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: Orlando Show

200 feet minimum distance up to 400ft..

So now lets talk above 400.. there has to be an increase there..

In the 1:1 world.. it could get upto 1200 ft.. so the 200ft is not going to cut it.

What say you..?

*Christopher M Doherty*
*Manager*
*Federal Aviation Administration*
*Emerging Technologies Division (AFS-751)*
*Office of Safety Standards, Flight Standards Service*
*800 Independence Ave S.W.*
*Washington, DC 20591*
*Email: Christopher.M.Doherty@faa.gov*
*Main Office Number 202-267-9700*
*Cell: 202-538-2352*

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Thursday, January 2, 2025 12:52 PM
**To:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: Orlando Show

**CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

I think 200 is reasonable in most circumstances. Universal is a unique case, I think the long term solution is a waiver just for their location, but I am not sure how we get there today.

Once we get unsuspended, I am not sure how fast Universal will want to resume their shows, but they have trained all their security personnel, have internal maps, and risk management did their own calculations based on a 155ft buffer. They will have to re-evaluate everything from show feasibility, show location, security requirements, lockdown procedures, etc.

## Preston Ward

General Counsel/ Chief Pilot

_____

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

---

**From:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Date:** Thursday, January 2, 2025 at 12:37 PM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: Orlando Show

Well,
200ft is the number being toss around at the moment..

So minimum 200ft?

Chris

*Christopher M Doherty*
*Manager*
*Federal Aviation Administration*
*Emerging Technologies Division (AFS-751)*
*Office of Safety Standards, Flight Standards Service*
*800 Independence Ave S.W.*
*Washington, DC 20591*
*Email: Christopher.M.Doherty@faa.gov*
*Main Office Number 202-267-9700*
*Cell: 202-538-2352*

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Thursday, January 2, 2025 11:49 AM
**To:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: Orlando Show

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

HI Chris,

We ran some numbers and I think the proposed formula would prohibit many shows, such as our nightly Universal Studios show. It would not be possible for UO to secure the needed amount of space for the show under that formula. This would also likely impact about 80% of the industry

3 of 7

shows nationwide.

As an alternative what about the below formula.

r = (v * √(2 * h / g)) * 2

r = horizontal range in meters
v= velocity in m/s
h= initial height
g= gravity (9.8m/s^2)

This would double the calculated trajectory.

## Preston Ward
General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

**From:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Date:** Thursday, January 2, 2025 at 10:46 AM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: Orlando Show

Oppps.. that slide didn't turn out right
Here is the corrected slide.

Does this make sense?

*Christopher M Doherty*
*Manager*
*Federal Aviation Administration*
*Emerging Technologies Division (AFS-751)*
*Office of Safety Standards, Flight Standards Service*
*800 Independence Ave S.W.*
*Washington, DC 20591*
*Email: Christopher.M.Doherty@faa.gov*
*Main Office Number 202-267-9700*
*Cell: 202-538-2352*

**From:** Doherty, Christopher M (FAA)
**Sent:** Thursday, January 2, 2025 10:33 AM

**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: Orlando Show

Preston,
After discussions with Gavin and others,  we will be making changes to all of the drone light show waivers.
So the ballistics formula that you used in your application will look something like this…

The application should also address procedures to abort the show in the event something goes wrong….
I understand you might have a drone dropping out now and then.. but there needs to be a clear threshold on what is acceptable
And what is not.. like… 4 or 5 drops is acceptable.. but 6 is not
Maybe flyaways are not acceptable…
Maybe 2 hard geofence actions constitute an abort..

We talked about single point of failure.. so I agree with the 2 RPIC signoff.. and we probably require that of everyone also.

So modify your waiver document and send that to me via email… Gavin will work this afternoon to have it ready.

Chris


*Christopher M Doherty*
*Manager*
*Federal Aviation Administration*
*Emerging Technologies Division (AFS-751)*
*Office of Safety Standards, Flight Standards Service*
*800 Independence Ave S.W.*
*Washington, DC 20591*
*Email: Christopher.M.Doherty@faa.gov*
*Main Office Number 202-267-9700*
*Cell: 202-538-2352*

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Thursday, January 2, 2025 9:34 AM
**To:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: Orlando Show

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Chris,

To stop a show there are 4 options. The hold command, land command, fast land command, return to home, and disarm command. These commands can be issued over the primary (WIFI) to all or

individual drones or over the secondary command link (rf). The hold command will just "pause" all the drones in place.  After the show is paused you cannot resume it and have to then use one of the other commands to get the drones out of the air.  The land command will land them land in place at a slow gradual decent. The fast land command is hybrid of the land and disarm commands where the drones land at a much faster pace. The return to home command returns all the drones to their launch position, however this is not a smart return to home.  This means it will take a direct flight path without regard to the other drones and would cause more collisions. If you issue this command to multiple drones at once there are the possibility for collisions.  The disarm command kills all the motors and the drones free fall to the ground.

The standard abort procedure is to pause the show, sort the drones by altitude, then start at the bottom of the formation and land and return to home.  In most instances landing is the safer option.  Talking with KC he thought that after the initial collision that the in-flight emergency was over and it was safer to allow the show to continue than to risk another event that could result in more collisions and could increase of the risk of further incident while aborting the show.

The company as a whole always stresses that safety is the most important thing in running a drone show. I believe KC should have aborted out as soon as he noticed he didn't set the path parameters and also should have aborted after they started to take off incorrectly. Part of the post incident training I am having with all the RPICs is not to hesitate when the need to abort a show arises. We are revising our new pilot training and ongoing pilot training to further enhance the discussions to talk through safe abort points and how to recognize them quickly.

Please let me know if you have any questions or need further clarification.

Thanks

**Preston Ward**
General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

**From:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Date:** Thursday, January 2, 2025 at 6:45 AM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** Orlando Show

Preston,
Here is one issue I have with the drone light shows.. and it has come to my attention in the Safety Event Report I received this morning.

". Due to the steps involved with pausing a show, and recovering airborne drones, the designated flight paths were a safer option for both the audience and the aircraft. The remainder of the fleet flew as expected, and landed at their predetermined locations."

I was told the show continued.. after the chaos started.
This is where traditional aviation and drone aviation have a hard time syncing up.
When the show started to have issues… not just one or two dropping out, and not even after there appeared to be a problem in the launching.. The show continued… When really the show should have stopped. Corrected the issue and then restarted.
Is there an override to stop the show and land all of the drones?
If not why/
If so, then why wasn't it used? – Was it company mindset issue?

This is another area we are going to have to address with all of the light shows.

Chris


**Christopher M Doherty**
*Manager*
*Federal Aviation Administration*
*Emerging Technologies Division (AFS-751)*
*Office of Safety Standards, Flight Standards Service*
*800 Independence Ave S.W.*
*Washington, DC 20591*
*Email: Christopher.M.Doherty@faa.gov*
*Main Office Number 202-267-9700*
*Cell: 202-538-2352*

**EXHIBIT G**

**EMAILS**

**Tuesday, January 7, 2025 at 14:27:31 Central Standard Time**

**Subject:** RE: RFI for Waiver 2025-00009
**Date:** Friday, January 3, 2025 at 2:52:18 PM Central Standard Time
**From:** Hill, Gavin M (FAA)
**To:** Preston Ward
**Attachments:** image001.png, image002.png, image003.png, image004.png, image005.png, image006.png

Received. Will work up the Waiver and get it signed. Won't be till later tonight or tomorrow. About to leave for Granddaughter's HS soccer game.

Going to fast track this one to Chris for signature

# GmH

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 2:50 PM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Just submitted in DZ.  We are going to be launching from Field ,1 located at 33.156353613404555, -96.83480586092209.

## Preston Ward

General Counsel/ Chief Pilot

_____

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

**From:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Date:** Friday, January 3, 2025 at 2:35 PM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: RFI for Waiver 2025-00009

Removed 'crash or' from the initial sentence as that is counter to the rest of the paragraph. A Crash is

not 'normal' in any regard.

Will meet you onsite Monday. Which area will you be setting up? Chris may also come out as he is in Decatur

**Loss of Drones:** If at any point during flight <span style="color:red">five (5)</span> of the drones are behaving abnormally, the RPIC shall hold the show and land the drones. Abnormal behavior shall not include the drones entering a failsafe response as intended. Examples of expected failsafe conditions include landing because of a low battery because of battery voltage sag, battery overheating, or landing because of loss of GPS.  Should three (3) of the drones impact the hard geofence, or if there is an inflight fire, <span style="color:red">or UA to UA collision</span>, the show shall be landed immediately.  Should one (1) drone not respond to the <span style="color:red">hard</span> geo-fence the show shall be landed immediately

# GmH

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 2:30 PM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Last sentence is for hard geofence. Essentially if a drone does not respond to the hard fence and keeps flying the show needs to stop immediately. This would be a true fly away situation.

Updated
> **Loss of Drones:** If at any point during flight <span style="color:red">five (5)</span> of the drones crash or are behaving abnormally, the RPIC shall hold the show and land the drones. Abnormal behavior shall not include the drones entering a failsafe response as intended. Examples of expected failsafe conditions include landing because of a low battery because of battery voltage sag, battery overheating, or landing because of loss of GPS.  Should three (3) of the drones impact the hard geofence, or if there is an inflight fire, <span style="color:red">or UA to UA collision</span>, the show shall be landed immediately.  Should one (1) drone not respond to the <span style="color:red">hard</span> geo-fence the show shall be landed immediately.

Just confirmed with the NCAA the show is happening Monday.  They would like some testing starting at 11AM, we would get on site at 8AM.

Let me know if the above looks good and I will get it in DZ.

**Preston Ward**

General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

**From:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Date:** Friday, January 3, 2025 at 2:23 PM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: RFI for Waiver 2025-00009

> **Loss of Drones:** If at any point during flight five (5) of the drones crash or are behaving abnormally, the RPIC shall hold the show and land the drones. Abnormal behavior shall not include the drones entering a failsafe response as intended. Examples of expected failsafe conditions include landing because of a low battery because of battery voltage sag, battery overheating, or landing because of loss of GPS. Should three (3) of the drones impact the hard geofence, or if there is an inflight fire, or UA to UA collision, the show shall be landed immediately. Should one (1) drone not respond to the geo-fence the show shall be landed immediately.

Chris and the higher ups want to start at 5 and we will revisit when the waiver is renewed in July. Which geofence is referenced in the last sentence? Soft or hard based on diagram on page 34?

The choice will be to amend the current waiver and let it run to expiration in July

Demonstration will need done prior to show on Monday. Or if event cancelled, prior to next event.

## GmH

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 2:09 PM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

How does this sound?

> **Loss of Drones:** If at any point during flight eight (8) of the drones crash or are behaving

abnormally, the RPIC shall hold the show and land the drones. Abnormal behavior shall not include the drones entering a failsafe response as intended. Examples of expected failsafe conditions include landing because of a low battery because of battery voltage sag, battery overheating, or landing because of loss of GPS. Should three (3) of the drones impact the hard geofence, or if there is an inflight fire, the show shall be landed immediately. Should one (1) drone not respond to the geo-fence the show shall be landed immediately.

## Preston Ward

General Counsel/ Chief Pilot

---

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

---

**From:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Date:** Friday, January 3, 2025 at 1:53 PM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Subject:** RE: RFI for Waiver 2025-00009

Edit then post to DZ in response to the RFI.

Beforehand email me the requested language so I can make sure I understand it to sell it!

## GmH

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 12:50 PM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Just confirmed show is still scheduled for Monday.

Preston Ward

**Preston Ward**

General Counsel/ Chief Pilot

+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

On Jan 3, 2025, at 12:21 PM, Preston Ward <Preston@skyelementsdrones.com> wrote:

 Sure 817-538-3207

Preston Ward

> On Jan 3, 2025, at 12:19 PM, Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov> wrote:

> Got a moment for a phone call?

**GmH**

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 11:43 AM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Cc:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Gavin,

I have attached the updated conops and checklist.  Please let me know if further changes are needed of if you have any questions.

Thanks,

**Preston Ward**

General Counsel/ Chief Pilot

---

&lt;image001.png&gt;    &lt;image004.png&gt; +1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

&lt;image005. &lt;image006. &lt;image007. &lt;image008.
png&gt;      png&gt;      png&gt;      png&gt;

---

**From:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Date:** Friday, January 3, 2025 at 11:29 AM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Cc:** Doherty, Christopher M (FAA)
<Christopher.M.Doherty@faa.gov>
**Subject:** RE: RFI for Waiver 2025-00009

That should work. Just make sure the site plan evaluation and any notes are made part of the show package records that can be recalled as needed.

**GmH**

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 11:27 AM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Cc:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Gavin,

Please let me know if the below is enough detail for the process.

This process begins with a review of commercially available information using google maps, google earth, or other such similar programs. If questions remain as to if there are potential hazards, obstructions, or if sufficient details cannot be obtained, then we

may have the client do a video call walk through to provide additional details that could not be obtained through the initial review.   An in-person site visit will occur prior to the day of the show and/or the show design process beginning for any sites that are abnormal, are in locations that may substantially impact the show design, or may have hazards that need further review or clarification.  On the day of the show the RPIC will confirm the details on the site plan and confirm that no hazards or other obstacles are present prior to setting up the show.

Thanks

**Preston Ward**

General Counsel/ Chief Pilot

---

<image001.png>        <image009.png>+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

<image013.   <image006.   <image007.   <image008.
png>        png>        png>        png>

---

**From:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Date:** Friday, January 3, 2025 at 11:10 AM
**To:** Preston Ward <Preston@skyelementsdrones.com>
**Cc:** Doherty, Christopher M (FAA)
<Christopher.M.Doherty@faa.gov>
**Subject:** Re: RFI for Waiver 2025-00009

That initial sentence is automatically printed out by the RFI generator. You can ignore it. The details are what I need.

If the on-site qualification inspection is only done based on possible site characteristics or location, then explain that in that paragraph so we understand when an on site validation or evaluation is required, and then the fact that an on site is done prior to the initial show. In other words, just explain exactly what it is that goes into that process

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Sent:** Friday, January 3, 2025 11:03:29 AM
**To:** Hill, Gavin M (FAA) <Gavin.M.Hill@faa.gov>
**Cc:** Doherty, Christopher M (FAA) <Christopher.M.Doherty@faa.gov>

**Subject:** Re: RFI for Waiver 2025-00009

> **CAUTION:** This email originated from outside of the Federal Aviation Administration (FAA). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi Gavin,

I just had two questions about the RFI, I think I have everything else implemented/updated.

1. You did not describe how the operation will remain safe during a failure of single and multiple small unmanned aircraft (sUA) simultaneously.

    I am not sure what details to add for this that are not already covered. Any guidance would be appreciated.

1. Confirm the site analysis is performed on site and not through video or visualization means

    Typically, we will do an in-person site visit if there is uncertainty as the location or if it looks abnormal.  If upon review of the site through our initial site analysis, we will conduct an in-person visit. However, if there are no concerns we typically will not do an in-person. For example, if the site is a golf course we wouldn't do an in-person site visit.  In either case, when the RPIC arrives on site their first duty is to confirm that nothing has changed, and no new obstacles are present as well as making sure the site plan requirements can be met.

Thanks

## Preston Ward

General Counsel/ Chief Pilot

---

<image001.png>                <image009.png>+1 (817) 538-3207

Preston@skyelementsdrones.com

SkyElementsDrones.com

<image013. <image014. <image015. <image016.
png>       png>       png>       png>

---

**From:** Preston Ward <Preston@skyelementsdrones.com>
**Date:** Friday, January 3, 2025 at 9:07 AM
**To:** Gavin M Hill <Gavin.M.Hill@faa.gov>
**Cc:** Christopher M Doherty <Christopher.M.Doherty@faa.gov>

**Subject:** Re: RFI for Waiver 2025-00009

Thanks Gavin. Working on it now.

Preston Ward

> On Jan 3, 2025, at 7:42 AM, Hill, Gavin M (FAA)
> <Gavin.M.Hill@faa.gov> wrote:
>
> Morning Preston,
>
> I have reviewed your submission and have sent you a Request
> for Information (RFI) for corrections and clarifications. To ensure
> you get the request in a timely manner I have included it here.
> Contact me as below or via email for any questions or
> clarifications.
>
>
> *Respectfully,*
>
>
> **Gavin<sup>M</sup> Hill / ASI**
> Federal Aviation Administration
> Emerging Technologies Division AFS-750
> C: 469.516.8931
> Gavin.m.Hill@FAA.gov
>
> <107W-2025-00009 Preston Ward - RFI.pdf>

<image001.png>
<image004.png>
<image005.png>
<image006.png>
<image007.png>
<image008.png>
<image009.png>
<image013.png>
<image014.png>
<image015.png>
<image016.png>

**EXHIBIT H**

**JANUARY 9 LETTER**

**STEIMEL COUNSELORS LAW GROUP**
A PROFESSIONAL LIMITED LIABILITY CORPORATION

**Walter E. Steimel**
Managing Member

January 9, 2025

**VIA Electronic Mail**
Lorelei.Peter@faa.gov
Lawrence.Fields@faa.gov

Lorelei Peter, Esq.                          Mr. Lawrence Fields
Chief Counsel (Acting)                       Executive Director (Acting)
Office of the Chief Counsel                  Flight Standards Service
Federal Aviation Administration              Federal Aviation Administration
800 Independence Avenue SW                   800 Independence Avenue, S.W.
Washington, DC 20591                         Washington, D.C. 20591

Re:   **Sky Elements LLC**
      **Waiver No. 107W-2024-02478**

Dear Chief Counsel Peter and Executive Director Fields:

   We are counsel to Sky Elements LLC ("Sky"), the holder of the above-reference waiver number. The FAA has recently suspended Sky's waiver, without providing details, due process, or an explanation of the process to be followed. We request that the FAA reconsider its suspension and immediately, but no later than close of business Monday, January 13, 2024, reinstate Waiver No. 107W-2024-02478, as set forth further below.

   Our client is an operator of drone light shows. It was formed and began providing drone light shows in 2021. In 2024 alone it has performed 775 shows consisting of 299,175 drone flights and approximately 54,852 flight hours. In 2023 it conducted 435 shows consisting of 113,529 drone flights. During the last 24 months Sky has amassed 75,665 flight hours of drone shows in front of live audiences. These numbers do not include the significant amount of drone flights and flight time incurred during testing and practice runs not in front of audiences.

   During its history Sky has experienced no incidents involving injury to flight crews, spectators, or third parties. It has had an exemplary safety record.

   On December 21, 2024, during a performance in Orlando, Florida, Sky's drones experienced a collision event resulting in three drones experiencing flight deviations, striking three spectators ("Incident"). One spectator was hospitalized but has been released from the hospital. The relevant facts are set forth in more complete detail in a letter from Preston Ward, General Counsel and Chief Pilot of Sky to Derek Hufty, Manager, General Aviation and Commercial Branch, FAA, dated December 30, 2024 ("Ward Letter")(attached).

**STEIMEL COUNSELORS LAW GROUP**
A PROFESSIONAL LIMITED LIABILITY CORPORATION

Lorelei Peter, Esq.
Mr. Larry Fields
January 9, 2025
Page 2

Mr. Ward sent his initial notification of the Incident within hours of it occurring on the evening of December 21 and flew to Orlando the next morning to begin Sky's internal investigation. He provided his initial report to the FAA the evening of December 22 and responded to the FAA's initial questions later that evening. Mr. Hufty of the FAA issued a letter suspending Sky's waiver pending an FAA investigation. The letter did not indicate investigation procedures, proposed timelines, or provide transparency of the process. It also did not explain the reasoning behind a company-wide suspension versus pilot or other reasonably tailored suspension or action.

Sky timely reported the Incident through the FAA's reporting system and continued its internal investigation and reported the results of its findings to the FAA (the Ward Letter) within nine (9) days of the Incident, on December 30, 2024. Sky removed the pilot in charge during the Incident. Sky's actions were prompt and responsive. Sky detailed the results of its investigation and proposed future corrective action in the Ward Letter. Sky adopted and immediately implemented actions and new procedures to guard against any similar future incident. Sky requested reconsideration of the suspension.

On January 2 the FAA followed up with additional questions and asked whether the Incident was the result of a "company mindset issue," based on some undisclosed internal informal communication. Mr. Ward corrected apparent misconceptions and provided further technical details involving all drone light shows. The FAA responded that after further internal discussions "we will be making changes to all of the drone light show waivers." The FAA issued a request for information (RFI) on January 3, and Sky responded the same day. The FAA requested modifications to Sky's "waiver document" and stated that the FAA would work to have the renewed waiver ready. Sky immediately submitted the requested waiver modifications. After a series of communications, the FAA suggested it would amend Sky's current waiver based upon its submission and permit it to stay in effect until its expiration in July of 2025, with a test demonstration of the changes conducted before the next show on Monday, January 6. The FAA's final notification on January 3, 2025, was that Sky's waiver would be reinstated in time for the show scheduled for January 6.

Contrary to the FAA's assurances, Sky has received only conflicting and indefinite statements about the status of its waiver, any FAA investigation, or any procedures to be followed. Its waiver has not been reinstated. As noted above, the FAA indicated it would lift its suspension so that Sky could resume operations. Instead, Sky was informed that "someone higher up" had placed a hold on lifting the suspension. We have no further information on that action. Upon being retained by Sky, I suggested that Sky withdraw its most recent submission until the FAA provides some clarity, transparency, and assurances. After I had time to review Sky's submission, I asked Sky to resubmit it with operational changes tailored to prevent a future accident, as previously discussed with the FAA. Sky's resubmission is 107W-2025-00098.

STEIMEL COUNSELORS LAW GROUP
A PROFESSIONAL LIMITED LIABILITY CORPORATION

Lorelei Peter, Esq.
Mr. Larry Fields
January 9, 2025
Page 3

Accordingly, Sky demands that the FAA either reinstate its current suspended waiver, 107W-2024-02478 as originally granted, or as amended by today's amendment 107W-2025-00098.

The FAA's investigation, procedures, and position on the suspension remain vague, and appear subject to interference by an undisclosed senior official. Further, an FAA official recently communicated with a Sky customer, regarding a show this summer, stating that Sky's waiver had been suspended and that Sky would not be able to conduct the show. The FAA official also opined that Sky may be grounded for two years. The FAA official's interference with Sky's customer relationship resulted in the customer terminating its contract with Sky with a revenue loss of $150,000.

The FAA's indefinite company-wide suspension has cost Sky a total of $1,000,000 in lost revenue between Decembre 24, 2024, and January 6, 2025, with an additional loss of $600,000 in revenue for shows that Sky had to refer to third parties to execute operations if this matter is not resolved immediately.

The FAA has provided Sky with no due process, administrative or otherwise, and its actions violate both the Administrative Procedures Act and the FAA's organic statute and regulations. Its procedures and investigation lack transparency, and its conduct to date has been arbitrary and capricious. The FAA has adopted no rules generally applicable to drone light shows, opting to provide waivers to various providers on an *ad hoc* basis with no consistency in treatment or regulations of general applicability, only indicating that it would modify all operator waivers based on matters identified by Sky. The FAA has instigated no Administrative Procedures Act compliant rulemaking of any kind, and is regulating through a series of *ad hoc* waivers, while holding Sky's waiver hostage in the process.

The FAA overreacted and adopted a position more akin to a summary execution of the company rather than a reasoned approach to investigation and regulation. We would expect the FAA to request suspension of the individual pilot involved in the Incident, or some other interim measure, but instead it chose to ground all of the operations of Sky for an indefinite period of time. FAA personnel have undertaken actions that far exceed its responsibilities under applicable law. It has engaged in direct contact with Sky customers and in one instance suggested that Sky would be grounded for two years. These actions and statements are made without any administrative due process, and Sky only learns of them through communications from its customers.

We demand an immediate cessation of the FAA's arbitrary and capricious treatment of Sky and that it comply with the Administrative Procedures Act. Specifically, we

1.      Demand that the FAA immediately reinstate Sky's waiver, either by reinstating its current suspended waiver, 107W-2024-02478, as originally granted or as amended by today's amendment, 107W-2025-00098. We demand reinstatement no later than noon Monday, January

STEIMEL COUNSELORS LAW GROUP
A PROFESSIONAL LIMITED LIABILITY CORPORATION

Lorelei Peter, Esq.
Mr. Larry Fields
January 9, 2025
Page 4

13, 2025. We intend to move for a TRO and injunction against the FAA if the waiver is not reinstated by our deadline.

      2.     We demand that the FAA undertake any investigation solely in compliance with the Administrative Procedures Act and that Sky's waiver remain active during any investigation.

      3.     We suggest that the FAA institute a rulemaking that complies with the Administrative Procedures Act to set forth basic operating rules and requirements generally applicable to all waivers and drone shows and cease and desist from using Sky's suggested improvements during informal communications as a basis for adopting *ad hoc* substantive and procedural requirements applied to all waiver recipients. If FAA waiver requirements are flawed then it should suspend all drone show operators while it modifies its requirements, but suspension of only Sky during this process is flawed and violates applicable law.

We request a call to discuss this matter immediately, at the phone number below, and demand immediate lifting of Sky's suspension by a written letter that Sky can share with all of its customers and the general public, if necessary, to minimize further irrevocable harm it experiences from the FAA's arbitrary and capricious conduct.

Please note that our deadline for lifting of Sky's waiver suspension is this coming Monday, January 13, 2025, at noon. This deadline is critical as the incoming administration will be replacing personnel soon after January 20th further complicating correction of the FAA's error, requiring court intervention.

Very truly yours,

Walter E. Steimel, Jr.

CC:    The Honorable Pete Buttigieg, Secretary, Department of Transportation
        The Honorable Michael Whitaker, Administrator, Federal Aviation Administration

**EXHIBIT I**

**CITY OF GARLAND LETTER**



## NOTICE OF TERMINATION

January 8, 2025

Sky Elements
820 W Sandy Lake Rd,
Coppell Texas 75019

Re: Termination Notice - 0044-25 Professional Services Agreement - Drone Shows, related to the City of Garland's July 3rd, 2025, Celebration (the "Agreement")

Dear Preston,

The FAA has informed the City of Garland that Sky Elements, LLC's ("Sky") is unable to operate under the FAA license outlined in Sky' Statement of Work and/or Proposal incorporated within the Agreement due to an incident occurring during a Sky drone show on December 21, 2024, in Florida and an ongoing FAA investigation related to the incident. Pursuant to Section 9 of the Agreement, the City of Garland hereby provides notice of termination. This termination is effective immediately.

The City directs Sky ("Contractor") to immediately cease all work under the Agreement upon receipt of this notice.

Should you have any questions or require further clarification regarding this notice, please contact Joel Wilson, the City's Contracts Manager, at **jwilson@garlandtx.gov** or **972-205-2427**.

The City thanks you for your cooperation and understanding in this matter.

Sincerely,

*Gary L. Holcomb*         01/08/2025

Gary L. Holcomb, CPPB, CPPO, C.P.M.
Director, Procurement & Contract Administration